```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION

 3   UNITED STATES OF AMERICA,  )
                                )   8:22-cr-437-WFJ-SPF-1
 4            PLAINTIFF,         )   Tampa
                                )   May 10, 2024
 5            v.                 )   11:31 a.m.
                                )
 6   JOHN LEE,                   )
                                )
 7            DEFENDANT.         )

 8                    TRANSCRIPT OF SENTENCING HEARING
                     BEFORE THE HONORABLE WILLIAM F. JUNG
 9                      UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:
         MS. TIFFANY E. FIELDS
12       MS. RACHELLE DESVAUX BEDKE
         MS. ANITA CREAM
13       United States Attorney's Office
         Suite 3200
14       400 N. Tampa Street
         Tampa, FL 33602-4798
15
     For the Defendant:
16       MR. BJORN ERIK BRUNVAND
         Bjorn E. Brunvand, PA
17       615 Turner Street
         Clearwater, FL 33756
18
     Court Reporter:            Tracey Aurelio, CRR, RMR, RDR
19                              Federal Official Court Reporter
                                801 N. Florida Avenue, 15th Floor
20                              Tampa, Florida 33602
                                (813) 301-5448
21
             Proceedings recorded by mechanical stenography,
22   transcript produced by computer.

23

24

25
```

I N D E X

SCOTT TERRY
    Direct Examination (Ms. Fields)                    10

1  _____

2      (Proceedings commenced at 11:31 a.m.)

3          THE COURT:  Good morning.  Let's call the case,

4  please.

5          THE COURTROOM DEPUTY:  Yes.  The Court calls

6  8:22-cr-437-WFJ-SPF, United States of America v. John Lee.

7          Counsel, if you can please state your appearance for

8  the record starting with the government.

9          MS. FIELDS:  Good morning, Your Honor.  Tiffany

10  Fields appearing on behalf of the United States.  At counsel

11  table with me today, I'm joined by AUSA Rachelle DesVaux

12  Bedke.

13          MS. BEDKE:  Good morning, Your Honor.

14          MS. FIELDS:  And FBI Special Agent John Hermann.

15          SPECIAL AGENT HERMANN:  Good morning, Your Honor.

16          MS. FIELDS:  And AUSA Anita Cream.

17          MS. CREAM:  Good morning.

18          THE COURT:  Good morning.

19          MR. BRUNVAND:  Good morning, Your Honor.  Bjorn

20  Brunvand on behalf of John Lee.

21          THE COURT:  Well, thank you.

22          And is Mr. Bini here, Mark Bini from Reed Smith?

23          MS. FIELDS:  Your Honor, Mr. Bini, I understand is

24  not present today; however, the Grunberg parties do have two

25  representatives here today.

1          THE COURT:  Just come forward.  I want to see if I

2    can iron out this thing, for today anyway.

3          Tell us who you are, please.

4          MS. GATZ:  Good morning, Your Honor.  My name is Lara

5    Treinis Gatz.  I have a pro hac vice application that I

6    submitted this morning, if the Court would grant that.

7          THE COURT:  It's granted.

8          MS. GATZ:  Thank you, Your Honor.

9          THE COURT:  Make sure you pay your $150.

10         MS. GATZ:  Yes, Your Honor.  And this is my partner,

11   James McCarroll, also from Reed Smith.

12         MR. McCARROLL:  Your Honor, also with the pro hac

13   vice application.

14         THE COURT:  Same ruling.

15         MR. McCARROLL:  Thank you, Your Honor.

16         Just to kind of focus on this I think to get it out

17   of the way.  So do I understand -- and then I'll ask the

18   government -- the gravamen or the entirety of the dispute is

19   on the 103.86 carat diamond.  That's what we're talking about?

20         MS. GATZ:  Yes, Your Honor.  But if you have seen, we

21   have stipulated with the government that we are not asking to

22   be considered a victim for these purposes.

23         THE COURT:  Understood.  That's understood.

24         But on restitution -- the forfeiture order, not

25   restitution.  The forfeiture order, the dispute is on this

 1  diamond?

 2        MS. GATZ:  Yes.

 3        THE COURT:  So you do not object, then, if I enter a

 4  forfeiture order on everything else except this?

 5        MS. GATZ:  May I just have one moment to speak with

 6  the government, Your Honor?

 7        THE COURT:  Yes.

 8        MS. GATZ:  Your Honor, I just wanted to confer with

 9  the government.  We do not object to the Court entering the

10  full order of forfeiture with all of the items.  And we are

11  going to work this out in an ancillary proceeding, if the

12  Court will allow that.

13        THE COURT:  Right.  So all the others but this

14  diamond they can have as far as you're concerned.

15        MS. GATZ:  Your Honor, they can have everything

16  including the diamond, and we're going to work that out with

17  them after.

18        THE COURT:  And the ancillary proceeding would then

19  be as to any monetary value coming out.

20        MS. GATZ:  Yes.

21        THE COURT:  Okay.  Well, that makes it real easy.

22  Will you do me a favor so I don't -- Ms. Cream will tell you,

23  I've been known to mess these things up.  So will you review

24  the order with the government, see if y'all can agree on what

25  I need to sign?

1          MS. GATZ:  Absolutely.  Thank you for the opportunity

2     to do that, Your Honor.

3          THE COURT:  Now, let's talk about the ancillary

4     proceeding.  Come on up, Ms. Cream, both of you.  Do you all

5     want to have cross motions for summary judgment?  Do you want

6     to do discovery?  What's the government say on that?

7          MS. CREAM:  Your Honor, I don't think that we are

8     there yet because we -- I know a claim has been filed as to

9     some assets, and AUSA Andrejko filed a motion to dismiss.

10          As to this diamond, I'd like to just make sure that

11     everyone is clear.  I'm not sure that they are actually going

12     to agree not to file a claim to the diamond.  I think they

13     will make that determination once the preliminary order of

14     forfeiture is entered.  I don't want to feel as though I have

15     tricked them here.  That's a decision for them to make once

16     it's entered.

17          It would be helpful to the United States, Your Honor,

18     if you could enter the draft order as opposed to an endorsed

19     order, because we then serve that on all potential third

20     parties.  And particularly for people who are not represented

21     by very experienced counsel, it can cause some confusion if

22     they don't have this kind of order.

23          And then once they decide what their position is

24     going to be in the ancillary proceeding, we could file a

25     motion for discovery with the Court if we think that's what's

```
 1  required, or set a notice.  I don't think we know yet.  The
 2  parties were just talking before the hearing, and I think we
 3  want to continue to talk to figure out if there is a
 4  resolution that can be worked out.
 5          THE COURT:  So I'm not going to grant the motion to
 6  dismiss or anything.  So we're going to do it this way.  So
 7  review that order.  If there is -- and then it would be my
 8  inclination, if there is a dispute and you are all at an
 9  impasse, to permit some limited discovery, like Zoom depos not
10  to exceed two hours, three or four of those, whatever is
11  needed.  And then if it gets to an ancillary proceeding, I
12  want to treat it just like a summary judgment, you know, some
13  discovery, plenty of time.  I don't want anybody to get the
14  bum's rush here.  It is a little trickier than just saying,
15  you know, you're out because there's New York law and all
16  that, which I know absolutely nothing about, although I do
17  know how to read cases.
18          MS. GATZ:  That sounds like an excellent plan, Your
19  Honor, and we'll certainly work with the government and we'll
20  review this in court today.
21          THE COURT:  Great.
22          MS. GATZ:  Thank you very much.
23          THE COURT:  Appreciate you coming.
24          Thank you, Ms. Cream.
25          So let's see if we can iron this -- yes, ma'am?
```

1         MS. BEDKE:  Your Honor, based in large part upon the

2    issues involving the Grunbergs' party claim, we are in a

3    position of asking the Court if we could bifurcate the

4    restitution portion of this sentencing proceeding and finish

5    it out within the 90-day limit afforded by the rules.

6         And the reason we're asking Your Honor is because we

7    know that when it comes to that phase, the Grunberg parties

8    may want to address the Court.  And there are other witnesses

9    the government may need to call to kind of provide a complete

10   context, if you will, so the Court is in a position to make an

11   informed decision at the end of the day.  Because Mr. Mark

12   Bini wasn't able to be here and this kind of happened fast,

13   that's what we are asking so that we can satisfy our

14   obligations under the Crime Victims' Rights Act.

15        THE COURT:  That application is granted.

16        MS. BEDKE:  Thank you, Your Honor.

17        Now, notwithstanding our request, we are prepared to

18   present a significant amount of information, testimony if you

19   will, from the appraisers that were engaged by the FBI to

20   examine and evaluate the pieces that were recovered, because

21   you are going to need that information also to make your

22   restitution amount determination.  And since they are here

23   today and we have some time, we would like to present that

24   testimony.  And then you will have it and can make use of it

25   at the subsequent proceeding.

```
 1          THE COURT:  Well, why don't we get that all out of
 2   the way now so they won't have to come back.  And they are
 3   just going to talk about, you know, this was a VS1 clear 9
 4   carat, blah, blah, blah.
 5          MS. BEDKE:  Exactly.
 6          THE COURT:  So it's not going to get into the
 7   cross-examination of whether this was a pawn or this was a
 8   sale or anything like that.
 9          MS. BEDKE:  Exactly right, Your Honor.
10          THE COURT:  Well, then why don't we do that now, if I
11   can beg the defense's indulgence to iron that out so these
12   folks don't have to come back from Quantico or DC or wherever.
13          MS. BEDKE:  Thank you, Your Honor.
14          THE COURT:  And this is without prejudice to any
15   later claim by the Grunberg interests or anyone else.
16          Okay.  Let's go ahead and do that right now then.
17          MS. FIELDS:  Your Honor, may I have just one moment?
18          THE COURT:  Of course.
19          MS. FIELDS:  The government calls Scott Terry.
20          THE COURT:  All right, Mr. Terry.  Thank you.
21      (Witness sworn.)
22          THE COURTROOM DEPUTY:  Please state your name and
23   spell your last name for the record.
24          THE WITNESS:  Scott Terry, T-E-R-R-Y.
25          THE COURTROOM DEPUTY:  You may be seated.
```

1    **SCOTT TERRY, CALLED BY THE GOVERNMENT, SWORN**

2                        **DIRECT EXAMINATION**

3    BY MS. FIELDS:

4    Q    Good morning, Mr. Terry.

5    A    Good morning.

6    Q    Mr. Terry, where are you from?

7    A    Tampa, Florida.

8    Q    Are you born and raised here?

9    A    Born in Boston but grew up in the area.

10   Q    And did you go to school here?

11   A    I did.  I went to high school in Palm Harbor, and I went

12   to UCF in Orlando.

13   Q    Did you obtain a degree there?

14   A    I did, in economics.

15   Q    What did you do after college?

16   A    After college, my brother and I, who is a graduate

17   gemologist, we started a gem-jewelry company doing appraisals,

18   buying, selling gemstones, recutting to improve value, a

19   number of different things within the gem and jewelry world.

20   Q    And is that a family business?

21   A    It is.  We're third generation in the industry.

22   Q    And how long -- or what is your company's name?

23   A    The company is Meridian Diamond.

24   Q    And how long have you guys been in business?

25   A    We started operation in 2010.

DIRECT EXAMINATION OF SCOTT TERRY

1  Q    Can you tell us a little bit about what you do on the

2  day-to-day with this business?

3  A    Day-to-day business, our main focus again is with

4  appraising and everything along those lines whether it's for

5  jewelry stores, private individuals.  A big portion of our

6  business is also purchasing through secondary markets,

7  improving stones by recutting them to improve their value, to

8  enhance their color, clarity, things along those lines to get

9  a good understanding of those unique aspects of the industry.

10 And then in addition, we put the stuff together ourselves and

11 build jewelry and that type of thing through -- obviously

12 through other, you know, contractors and things like that that

13 build the stuff for us.

14 Q    And you mentioned that there's a potential graduate

15 degree from GIA.  Can you tell us a little about what that is?

16 A    So it's the graduate gemologist degree that my brother

17 holds.  He's definitely the one that brings the unique

18 understanding and aspect of the particular attributes of

19 gemstones and understanding exactly what their qualities are,

20 where they're from, by understanding origins and things, you

21 know, unique attributes that can tell you and indicate those

22 particular things within the gemstone.

23       And then that graduate gemologist degree is kind of

24 like the pinnacle of degrees within gems and gemology.  That

25 is obtained from the Gemological Institute of America which is

DIRECT EXAMINATION OF SCOTT TERRY

1 like a -- they basically put the language together and put

2 reports on stones so that you could speak the same language

3 whether you're telling someone in New York or in Hong Kong

4 what the actual diamond or gemstone looks like.

5 Q    And do you hold that particular degree as well?

6 A    I do not personally, no.

7 Q    Does your experience come from your day-to-day

8 operations --

9 A    It does.

10 Q    -- in working with your brother?

11 A    Yes.

12 Q    You mentioned valuations.  Can you tell the Court a

13 little bit about the difference between a liquidation

14 valuation, a fair market valuation, and a retail replacement

15 valuation?

16 A    So a liquidation value is going to be basically the

17 lowest portion of the food chain, right?  It's when you're in

18 an immediate need to sell something, you don't have -- time is

19 not on your side.  You need to immediately fund something else

20 in your life, and you're trying to bring that stone to someone

21 who has those funds available and they can kind of cash you

22 out immediately.

23      Fair market value is going to be kind of one step

24 above that.  Some could, you know, interpret it.  And a lay

25 kind of concept of it would be like the wholesale value.  And

DIRECT EXAMINATION OF SCOTT TERRY

1  this is when both buyer and seller are compelled to act to

2  purchase something at a market value that typically things are

3  trading or selling for at that time.

4      Fair market value, they would also obviously have

5  access to different avenues of selling, whether they could

6  take it to auction, they could sit, wait for someone to call

7  them like an open channel or platform basically with their

8  advertised asking price.

9      And then of course beyond that is like a retail type

10 value.  And that would be if someone were to purchase the

11 stone on a fair market and then take it through their sales

12 channel, which is their own company or brand and apply that

13 kind of value to it and then sell it on to somebody that

14 doesn't have access to like a wholesale market.  Taxes, duties

15 and things like that may be also involved in that retail

16 replacement type value.

17 Q    How do you develop the valuations?

18 A    So in terms of developing a valuation first, you are

19 obviously going to understand what the particular stone or

20 jewelry item is.  You're going to break down the gemological

21 attributes of it.  Oftentimes, people understand like the four

22 Cs of the diamond, the carat weight, the color, the clarity.

23 Those are more simplified kind of aspects of it.

24     And then from there, we're going to utilize

25 historical sales data, especially for things that are unique

DIRECT EXAMINATION OF SCOTT TERRY

1   or there's not a million comps out there on like an open

2   market platform, but if there are significant amounts of

3   comparable items available for sale on like a wholesale trade

4   application or something along those lines, you are able to

5   understand, okay, what comps might sell for, what average

6   prices are, and then also to, you know, kind of leaning on

7   particular trade publications, price lists that obviously the

8   majority of the gem and jewelry industry accepts as, you know,

9   a leading indication of what those prices actually are in the

10  market.

11  Q    Were you and your company Meridian engaged by the FBI to

12  inspect and evaluate a number of items of jewelry and other

13  goods in this case?

14  A    We were.

15  Q    And what steps did you take to conduct that inspection?

16  A    So these items were available for us to inspect at the

17  FBI office here in Tampa.  We were able to inspect them up

18  close, in person using a number of gemological tools.

19         And then in addition to, the majority of them had lab

20  reports to kind of lean on as well.  So we were able to kind

21  of compare.  So we had, you know, an additional set of eyes

22  that had previously seen these in laboratories to understand

23  that they're not synthetic.  They're using advanced

24  gemological equipment that obviously we wouldn't be able to

25  pull in in a briefcase.

DIRECT EXAMINATION OF SCOTT TERRY

1              And then as far as understanding those unique

2    features of the gemstones, then we go further to look at comps

3    on the marketplace, like I previously mentioned, in

4    understanding exactly what those valuations are.

5    Q    And where did you conduct these inspections in this case?

6    A    These were at the FBI office in Tampa.

7              MS. FIELDS:  Your Honor, may I approach the witness?

8              THE COURT:  Yes.

9              MS. FIELDS:  Your Honor, may I approach the bench?

10   BY MS. FIELDS:

11   Q    Mr. Terry, I handed you three documents.  The first

12   document there is a table, a spreadsheet.  And have you seen

13   this document before today?

14   A    This?

15   Q    Yes.

16   A    Yes.

17   Q    Okay.  And did you create that document?

18   A    I did not, no.

19   Q    But you reviewed that with the government, correct?

20   A    Yes.

21   Q    The other two items that I have handed you, do you

22   recognize those items?

23   A    Yes.

24   Q    What are those sets of documents?

25   A    These are the liquidation value appraisal and the fair

DIRECT EXAMINATION OF SCOTT TERRY

1  market value appraisal that we produced.

2  Q    At the Meridian?

3  A    Yes, ma'am.

4  Q    Thank you.

5        MS. FIELDS:  Your Honor, we'd move to admit what will

6  be marked as Government Exhibit 1, being the summary chart;

7  Exhibit 2 as the liquidation table or the liquidation packet;

8  Exhibit 3 as the fair market value package.

9        THE COURT:  Admit.

10  BY MS. FIELDS:

11  Q    Mr. Terry, I want to walk through the summary chart there

12  that you have.  And the Court has a copy there, and you have

13  one.  And I want to start with Item No. 1.  On this summary

14  chart, there's a section that says "Appraisal ID Number and

15  Description" with values.  And we don't see anything in those

16  columns.  Why is that?

17  A    We did not see that item.

18  Q    For this particular item, is there any reason to believe

19  that the purchase price of four and a half million is not an

20  adequate representation?

21  A    Without understanding further details, it's impossible to

22  understand exactly what the purchase price may have been, but

23  it would be very speculative to say exactly what may or may

24  not have been their actual purchase price.  But you can assume

25  based on the other things that the person owned that it

DIRECT EXAMINATION OF SCOTT TERRY

1  wouldn't be wild to think outside of that.

2  Q    I want to direct your attention to page 11 of this packet

3  where it says "Victim Item Number 15."  And that's another one

4  we don't see an appraisal liquidation or appraisal fair market

5  value.  Can you explain that?

6  A    This also -- this was not something that we saw or that

7  was in the inventory of items at the FBI.

8  Q    Is there any reason to believe that a purchase price of

9  $100,000 is not a reasonable estimation of the value of that

10  item?

11  A    There would be no reason to believe that.

12  Q    Thank you.

13        Victim Item Number 2, and in your appraisal report

14  it's Item Number 1B17, can you tell the Court about this

15  particular item or this ring?

16  A    This ring, as far as what we saw it as, was a 33-carat, D

17  color flawless, cushion brilliant cut diamond.  It was assumed

18  that it had come from a particular setting.  What was also

19  present in that setting was inscribed with 42.67 carats on the

20  inside of the shank of the ring or actually the band portion

21  of the ring which gave kind of a little bit of an indication

22  that it may or may not have been cut from that 42 carat to a

23  33-carat diamond.

24  Q    And what was the fair market value appraised at for this

25  particular 33.34-carat stone?

DIRECT EXAMINATION OF SCOTT TERRY

1  A    That one was approximately $3.7 million.

2  Q    Now, if this stone were to be intact at 42 carats,

3  approximately how much additional value do you think we would

4  see for the fair market value, a rough estimate?

5  A    The easiest way to kind of do the math would be to assume

6  that you could divide that fair market value by the weight of

7  the stone in its current state, assuming you're at

8  approximately a hundred thousand dollars a carat, and then

9  just kind of do the math backwards.  By that 42.67 carats, you

10  can assume it may be, you know, mid $4 million kind of price

11  point without doing perfect math.  So it could have lost

12  around a million dollars, I guess, in terms of its, you know,

13  from its original state to what it currently is now.

14  Q    For Item Number 3 and Item Number 4, you reviewed both of

15  those items?

16  A    Yes.

17  Q    And were both of those items intact?

18  A    They were intact.  They were intact, yes.

19  Q    Any indication that they had been changed in any manner?

20  A    Not to our belief, no.

21  Q    And you have provided both a liquidation value and a fair

22  market value for those items, correct?

23  A    Yes.

24  Q    Why would that appraisal value vary substantially from

25  the original purchase price?

DIRECT EXAMINATION OF SCOTT TERRY

1  A    This again kind of goes back to the concept of fair
2  market value versus retail replacement value.  Again, we were
3  not tasked with creating retail replacement values for the
4  items.  So these fair market values are going to typically be
5  significantly less than what a retail replacement would be.
6          Obviously, too, markets ebb and flow.  In particular,
7  yellow diamonds carried a more significant price point in the
8  mid 2010 era.  They have softened over time.  And our numbers
9  are really just looking at what these may sell at in a fair
10 market or maybe at an auction type setting where someone like
11 this brand, in particular Jacob & Company, could purchase this
12 stone and then obviously make their retail markup on it.
13 Q    Item Number 5, and this is going to be 1B38G and 1B38F
14 within your appraisal reports, was this ring recovered intact
15 or was it deconstructed in a manner?
16 A    So this was actually -- it did not appear as if it was a
17 ring.  It may have -- you know, our understanding of it when
18 we looked at it, was it was an enhancer, which would be
19 typically like a broach or an additional piece of -- as we
20 noted here, like a tiara.  Sometimes they will have like a
21 screw adapter.  Apparently, it could have been attached to a
22 ring as well.  We did not see the ring portion of it.  So it
23 was not intact.  All of the stones were loose.  The center
24 stone was missing.  We just kind of placed them back in the
25 setting for that image.

DIRECT EXAMINATION OF SCOTT TERRY

1  Q    Now, this particular ruby, if it changed in size at all,

2  would it have significantly impacted its value?

3  A    If an item like this, I mean, if the center stone, for

4  instance, is changed in size then, yes, when we calculate

5  values in jewelry, we are typically going by price per carat.

6  So if you have less carats, you have less price.

7  Q    Are there times when a stone may change slightly in carat

8  size but actually enhance the value?

9  A    There are particular times when someone would attempt to

10 increase a value by manipulating the stone and taking weight

11 off of it.

12 Q    And in this particular instance if the fair market values

13 are higher than the original purchase price, why might that

14 be?

15 A    We're looking at, you know, close to, what, an 18-year

16 span of time where obviously people aren't purchasing

17 gemstones and particular gemstones of this quality and nature.

18 The goal is obviously to have an increase in value over time.

19 So this particular type of item, a ruby like this has gone up

20 significantly since 2006.

21 Q    Is it possible to roughly estimate the cost of putting

22 the top piece, the ruby with the diamonds around it, back onto

23 the ring?  Is it possible to estimate how much it may cost to

24 put these two back together?

25 A    The unexperienced jeweler at a retail price and not

DIRECT EXAMINATION OF SCOTT TERRY

1   understanding exactly, you know, like my knowledge wasn't to

2   inspect it as far as what it may take to repair it, you could

3   assume though that a high brand like Cartier may charge around

4   $10,000 to rebuild it, again not understanding exactly what

5   the bottom of the ring looked like either.

6   Q    For Item Number 6, was this item recovered intact?  And

7   this is 1B16 in your appraisal reports.

8   A    Number 6, we did evaluate this item.  This is 1B16, the

9   46-and-a-half carat sapphire.  We did evaluate this item.  It

10  was just loose from the setting though.  It was not actually

11  set in the setting.

12  Q    And the fact that the setting was recovered and the stone

13  was loose, would that impact the value of the stone?

14  A    Not necessarily, no.

15  Q    And because Item Number 6 was purchased with Item

16  Number 12, I'd like to go ahead and direct your attention to

17  Item Number 12, which I believe is 1B24 and 1B5.  Can you

18  describe for the Court what these items are?

19  A    1B12 or 1B5 you're saying?

20  Q    Yes, 1B5 and 1B24.

21  A    And 24, I'm sorry, was what?  It was a sapphire.

22  Q    Sorry.  1B24 I believe was the chain.

23  A    Sorry about that.

24       These were 100 carat D flawless cushion cut.  That

25  stone was loose by itself.  And then the chain that it was

1 detached from was a rather significant diamond tennis chain

2 that had that kind of like enhancer on it that the 100 carat

3 hung from.  The original image, we did not see the setting or

4 like those marquise diamonds that surround that large center

5 stone.

6 Q    So as I mentioned, Item Number 6 and Item Number 12 were

7 originally purchased together for approximately $22.1 million.

8 Would it be reasonable to estimate that the loss here to the

9 victim, meaning those stones that are around the pendant, the

10 setting and putting it back together based off the retail

11 value be approximately $2.9 million?

12 A    In consideration of the loss of the marquise stones?

13 Q    Yes.

14 A    It would be difficult for me to speculate on exactly what

15 the valuation on those being lost would be, being the fact

16 that we did not see those marquises, so we didn't have the

17 ability to evaluate them.  If you were just doing the simple

18 math to say, you know, the difference of the purchase price in

19 2008, which obviously was less than what you could replace

20 things for today at retail, I think it would be inappropriate

21 for me to speculate on the exact number of what would be, you

22 know, that -- consider that loss in that one.

23 Q    Thank you.

24        For Item Number 7 we have -- with Victim Item 7,

25 1B15, there is a ruby just below that.  Were you able to

DIRECT EXAMINATION OF SCOTT TERRY

1  inspect that the particular ruby?  And this is on page 4 of

2  the report.

3  A    We did not see that, no.

4  Q    And if we have receipts from the most recent purchaser of

5  that stone that it sold for 425,000, would you have any reason

6  to doubt that?

7  A    I would not have any reason to doubt that someone would

8  pay $425,000 for that, no.

9         THE COURT:  Let me interrupt.  I find this very

10  thorough.

11         Mr. Brunvand, does the defense object to any of these

12  values or his expertise?

13         MR. BRUNVAND:  No, Your Honor.

14         THE COURT:  I don't think we need to go through every

15  one.  I certainly accept Mr. Terry's expertise and this

16  report, which anyone can contradict by an adverse report if

17  they wish before we get to the end of this.  So I don't think

18  we need to go through every one.

19         MS. FIELDS:  Thank you, Your Honor.  If I may just go

20  through a couple of items that I think may cause the Court

21  some concern in valuating.

22         THE COURT:  Okay.

23         MS. FIELDS:  First I want to go to Item Number 11.

24  And this is 1B1 and 1B9 in the appraisal reports.

25  BY MS. FIELDS:

DIRECT EXAMINATION OF SCOTT TERRY

1  Q    Mr. Terry, can you describe for the Court what you

2  understand the original item to have been for this, for Victim

3  Item Number 11?

4  A    Number 11, it was what the original stone was.  And as it

5  stands in today's world too is what it is currently, a rather

6  significant 20.45 carat internally flawless natural fancy

7  vivid pink emerald cut diamond.

8  Q    And is it significant that this particular stone was 20

9  carats?

10 A    A 20-carat stone of this size is one in five in the world

11 probably.

12 Q    When you observed the pink stone at 1B1 and 1B9, what did

13 you inspect?

14 A    We looked at a 13.15 carat fancy vivid pink VVS1 emerald

15 cut and a 3.07 fancy intense pink internally flawless

16 heart-shaped diamond.

17 Q    So the first question that I have is, do you have an

18 opinion as to whether or not the heart-shaped diamond and the

19 emerald diamond that you inspected were from the same stone?

20 A    You can come to that conclusion pretty easily based on

21 the measurements, especially of the 13 carat.  The depth

22 measurement of the 13 carat and the 20 carat are the exact

23 same.  So a very challenging thing to get even like a

24 perfectly square stone perfectly square, believe it or not.

25 You'll typically have, if it's eight by eight, it might be

DIRECT EXAMINATION OF SCOTT TERRY

1   8.00 by 8.01, and that's with the most careful cutter trying

2   to really perfect the squareness of something, so the fact

3   that those depths are exactly the same.

4         And then you can assume too the heart shape has kind

5   of a funny cutting style.  It has a flat top to it that you

6   can assume may have come from the top table portion of the

7   emerald cut.  And then it has a flat bottom as well that is

8   untypical of heart-shaped diamonds, but it may have been like

9   the base or angled side in of what the end of that 20-carat

10  emerald cut may have been.

11  Q    And you mentioned that there are times when diamonds can

12  be cut and increase value.  Is this one of those

13  circumstances?

14  A    This clearly wouldn't be in anyone's interest to lose --

15  we're looking at here 4 carats of pink diamond would be

16  significant, especially when you consider a 3 carat pink

17  diamond of a fair market value of $2.1 million approximately.

18        The pink diamond also downgraded in terms of its

19  color grade.  So that's not a bonus in any sense of the word.

20  So, no, you definitely wouldn't want to cut that stone into

21  two different pieces.  It's not worth it.

22  Q    If the 13 carat that was remaining that you reviewed were

23  placed up for auction, what do you believe the starting bid

24  price may be for a stone of this caliber?

25  A    You can assume -- in terms of a 20-carat stone?

DIRECT EXAMINATION OF SCOTT TERRY

1  Q    As the 13 carat.

2  A    As the 13-carat stone, it actually did go to auction.

3  And the estimate for the stone started at $35 million.

4  Q    And intact as a 20 carat, what do you believe would be a

5  reasonable estimation of a starting bid for this stone as a

6  full 20-carat stone?

7  A    You could assume the stone could go -- you know, you

8  could basically average it out to understand what they would

9  assume a fair market value would be on the stone.  You could

10  say it would probably be in the $4 million carat range to

11  $5 million per carat.

12  Q    And so in which case the starting bid would be around

13  80 million?

14  A    Eighty to $100 million I'm sure they would probably

15  assign an estimate to.

16  Q    And the same question for the pink.  If you can

17  reasonably estimate what may be a starting bid for the

18  heart-shaped?

19  A    For the heart-shaped, the heart-shaped you can assume is

20  going to be 750 to a million dollars a carat, less significant

21  size, less significant color.

22  Q    So then a starting bid may be close to a $3 million

23  range?

24  A    Yes.

25  Q    This stone at 20 carats, would it be possible to replace

DIRECT EXAMINATION OF SCOTT TERRY

1  this stone?

2  A    You couldn't make a phone call and replace it, no.  It

3  definitely would take time if it were possible at all.

4  Q    Item Number 10, the final of these jewels that I want to

5  address, and this is 1B21, can you describe for the Court how

6  you reached the fair market valuation for this necklace?

7  A    So for this necklace, fair market valuation was based on

8  individual items in their current state.  So as far as just

9  the metal is material value in terms of the actual setting of

10  the necklace.  And then we charted out I believe 134 different

11  loose diamonds.  And those were all based on their comps on

12  the marketplace in terms of what it may cost for a jeweler to

13  purchase those on the open market.

14         MS. FIELDS:  Your Honor, may I approach the witness?

15         THE COURT:  Yes.

16  BY MS. FIELDS:

17  Q    I'm handing you a recent report just to simply refresh

18  your recollection, not to place it in evidence.

19         Approximately how many stones from this necklace were

20  there to begin with?

21  A    In terms of what we saw, we saw 138 stones.

22  Q    That's how many you reviewed?

23  A    How many we reviewed that were presented to us as part of

24  this necklace, yeah.

25  Q    And how many do you believe that this necklace had to

1  begin with?

2  A    In terms of the list that we received through a review

3  against the necklace, there was a 153 stones, I believe.

4  Q    And so how many are potentially still missing from this

5  particular item?

6  A    The stones that we did not see to match, there were 16

7  stones that we couldn't find matches to.

8  Q    Now, when a piece like this is constructed, is there any

9  significance as it pertains to the designer or the brand?

10  A    There is for sure.  In terms of just matching individual

11  stones to go next to each other, a matched pair of earrings

12  has an increase in value because there's two stones that look

13  like each other.  It takes time.  It takes effort.  And it

14  takes -- you know, this person is a professional.  He has a

15  brand that puts these things together so they all lay out

16  nicely and have an ideal look to them.  They're worth more as

17  a grouping than they are individually.

18  Q    And if each of these stones are all within one necklace,

19  would that change the value of any of the stones if they were

20  sold individually, separated out?

21  A    It would.  There would be more value assigned to them if

22  they were all put together in one branded necklace especially.

23  Q    And is there any way to speculate as to what this

24  particular necklace may have cost if completely constructed

25  with all of its parts today?  Is it even possible to

DIRECT EXAMINATION OF SCOTT TERRY

1   speculate?

2   A    It would be very tough to speculate right off the top of

3   my head in terms of something like that.  You can assume

4   somebody like this, if -- you know, if it took them to go to

5   the fair market and purchase each item individually, and I

6   don't know what our total actually came out to, but let's just

7   say if it cost them a million dollars, they would probably

8   want to sell it for $2 million.  So they would essentially

9   want to double their money of whatever, you know, fair market

10  value may be as the items currently were in their state.

11  Q    Now, were there a number of other items that you reviewed

12  that include watch sets, pins, clocks?

13          THE COURT:  Counsel, if this is in the report, we

14  don't need to -- this is for restitution, right?

15          MS. FIELDS:  That is correct, Your Honor.

16          THE COURT:  Well, I accept the report.  I don't

17  think -- the reports, I don't think there is any objection to

18  them.  And whether it's, you know, $80 million or

19  $140 million, it seems highly unlikely that Mr. Lee is going

20  to be able to pay any of that back.  So I don't really find

21  this a good use of time.

22          So is there something beyond these reports that you

23  need in evidence now?  They're in evidence.  I accept them.  I

24  don't think there's any objection to them.

25          MS. FIELDS:  Thank you, Your Honor.

1          I believe the only other question that I would ask

2   Mr. Terry is whether or not he could speculate or believes

3   that there may be a third piece of that 20-carat diamond

4   anywhere or what he believes may have happened in the cutting

5   of that stone?

6   A     Yeah.  In terms of what may have come off of it, if

7   someone was incentivized to keep the items and they were

8   acting in their own best interest, they may have recovered,

9   you know, smaller, less significant portions of the stone.

10  The majority of those portions, though, may have just kind of

11  ended up in the cutting wheel and, you know, become dust.

12          MS. FIELDS:  Your Honor, may I have just one moment?

13          THE COURT:  Yes.

14          MS. FIELDS:  Your Honor, we will tender the witness.

15          THE COURT:  Any cross?

16          MR. BRUNVAND:  No questions, Your Honor.  Thank you.

17          THE COURT:  Mr. Terry, thank you very much.  Very

18  impressive and a very unusual case for us.  Thank you.

19          All of these are accepted.  And I find him qualified.

20  And I find them solid, bona fide reports that the courts may

21  rely upon.

22          All right.  Anything else before we get to the

23  sentencing?

24          MS. FIELDS:  No, Your Honor.

25          THE COURT:  Can we swear Mr. Lee, please.

DIRECT EXAMINATION OF SCOTT TERRY

1          THE COURTROOM DEPUTY:  Mr. Lee, please stand and

2    raise your right hand.

3          (Defendant sworn.)

4          THE COURTROOM DEPUTY:  Please state your name and

5    spell your last name for the record.

6          THE DEFENDANT:  John Lee, L-E-E.

7          THE COURTROOM DEPUTY:  Thank you.  You may be seated.

8          THE DEFENDANT:  Thank you.

9          THE COURT:  Mr. Lee, you entered a plea of guilty in

10   November to Count 4 of the indictment which charged you with

11   mail fraud, and Count 7 which charged you with interstate

12   transportation of stolen property in violation of Title 18

13   U.S. Code.  I previously accepted your guilty plea and

14   adjudged you guilty of those offenses.  We are here for your

15   sentencing.

16          Have you had enough time to review these matters with

17   Mr. Brunvand?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  And are you satisfied with his services

20   to date?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Let's focus on the PSR.  And what I need

23   from the defense is any objections factually or numerically.

24   And I'm looking at the date, the revised date of February 26,

25   2024.

DIRECT EXAMINATION OF SCOTT TERRY

1           MR. BRUNVAND:  We have no objections factually or to

2    the calculations, Your Honor.

3           THE COURT:  And I did receive a 5K we can talk about

4    in a minute.

5           And, government, have you any objections factually or

6    numerically to the PSR?

7           MS. FIELDS:  No, Your Honor.

8           THE COURT:  All right.  Well, let's talk about the

9    one that I have an issue with of all my little questions for

10   you all.

11          So if you'll turn to 2B in the guidelines, if you

12   have the book.  If you don't, I have many back here.

13   2B1.1(b), I guess it's (b)(10), and there's a two-point

14   enhancement if a substantial part of the fraudulent scheme was

15   committed from outside the United States.

16          So as I understand the case, Mr. Lee importuned this

17   lady, whether she was in cahoots or not, to steal this guy's

18   jewels, this gentleman's jewels.  The essence of the crime is

19   the theft and the serial shipping of, A, the stuff had to be

20   either converted civilly or stolen criminally.  I don't think

21   it's relevant.  But she was his agent, and it is like this is

22   a bank robbery and he had somebody rob a bank in Paris, okay?

23   And then she sent all the loot over here and he laundered it.

24          Government, why is this not -- why was not a

25   substantial part of this crime committed outside the United

DIRECT EXAMINATION OF SCOTT TERRY

1  States?

2       MS. FIELDS:  Your Honor, in reviewing the case law as

3  it pertains to this particular enhancement -- and I know this

4  is within the filing at Doc 56, but it seemed that there was a

5  distinction between Mr. Lee's involvement in this particular

6  scheme compared to what we've seen in *United States v. Singh,*

7  which was 291 F.3d 756, and what we've seen in *De Aguiar,*

8  which I believe, Your Honor, is 453 Fed. Appx. 927, and both

9  of those were Eleventh Circuit cases.  And what we saw is kind

10  of a distinguishing factor here, is that particularly in

11  *De Aguiar,* and I know I'm probably not pronouncing that name

12  correctly, but we had a defendant there that was conducting a

13  scheme from the United States similar to Mr. Lee, right?  But

14  the beginning portions of that scheme were happening within

15  the country of Brazil.  The middle portions of that scheme

16  were occurring within Brazil.  The final proceeds that came

17  about from that scheme went back to individuals within Brazil.

18  And so there we had a distinguished beginning, middle, end.

19  The majority of that particular crime occurred within another

20  country.

21       Here what we have is we have Mr. Lee in the United

22  States when he develops his plan.  And I think that's where --

23       THE COURT:  Didn't he have an agent to carry out his

24  plan?

25       MS. FIELDS:  I believe so, Your Honor.

DIRECT EXAMINATION OF SCOTT TERRY

1        THE COURT:  Of course he did.  And what was the plan?

2  To steal Mr. [Victim] or whoever's it is jewelry, right?

3        MS. FIELDS:  Yes, Your Honor.  The plan was to

4  obtain --

5        THE COURT:  Where did that happen?

6        MS. FIELDS:  I'm sorry?

7        THE COURT:  Where did that happen?

8        MS. FIELDS:  The theft of the items occurred in Doha,

9  Your Honor.

10        THE COURT:  Count 1 -- or Count 4, the first count he

11  pled to was mail fraud, mostly FedExes?

12        MS. FIELDS:  That is correct, Your Honor.

13        THE COURT:  Sent from where?

14        MS. FIELDS:  From Doha, Your Honor.

15        THE COURT:  What's the difference between this case

16  and me having a co-conspirator or an agent to rob the bank in

17  Paris and send me the money.  So they do -- what all the bank

18  robbers do is they stake out of place, they sluice out when

19  the -- whoever it is, Mr. Victim is not going to be home and

20  they sneak into the bank.  Here she snuck into his vault.  It

21  seems to me the very essence of this crime was stealing the

22  guy's loot, and they did it all in Qatar.  I mean, you don't

23  dispute that.

24        And then the other count is basically he fenced it.

25  He transported it in interstate, which also would be crossing

DIRECT EXAMINATION OF SCOTT TERRY

1  the United States border from Qatar.

2       Anything else on that?  And then I'll ask

3  Mr. Brunvand.  The whole thing happened over there other than

4  him fencing the loot.  Anyway, anything else that you wish to

5  add on that?

6       MS. FIELDS:  Your Honor, I would just say that while

7  the theft did occur there, the scheme did involve submitting

8  false and fraudulent statements.  It involved not just the

9  acquisition of the goods but it also encompassed the selling

10 off of those goods and getting those proceeds.

11      THE COURT:  The issue is whether a substantial part

12 of it occurred there.

13      MS. FIELDS:  Yes, Your Honor.  I believe a key part

14 certainly happened there.  If we're looking at the full scope

15 of the scheme --

16      THE COURT:  If key means substantial, then it's plus

17 two, right?

18      MS. FIELDS:  Well, Your Honor, if we look at the full

19 scope of the crime, one portion occurred there.

20      THE COURT:  The most important portion.

21      MS. FIELDS:  The remaining portions occurred in the

22 United States.

23      THE COURT:  The main portion occurred in the United

24 States?  If the thing in Qatar hadn't happened, there'd be no

25 crime, right?

DIRECT EXAMINATION OF SCOTT TERRY

1          MS. FIELDS:  I apologize.  I meant to say the

2    remaining portions, not the main portion, Your Honor.  I

3    apologize.

4          THE COURT:  Anything else before I ask Mr. Brunvand?

5          MS. FIELDS:  No, Your Honor.  Thank you.

6          THE COURT:  It seems like a no-brainer Mr. Brunvand.

7    You stole a hundred million dollars worth of jewels in Qatar

8    with an agent.  I don't know whether she was tricked or in

9    cahoots.  She was your right arm, and you told her get the

10   stuff, I'll make the heebie-jeebies go off of it.  I mean, why

11   didn't a substantial portion of this happen outside the United

12   States?

13         MR. BRUNVAND:  Your Honor, the portion that happened

14   in Qatar basically was an employee of the shake going into the

15   safe in the home that she lived in, stealing the jewelry, and

16   then putting them in FedEx and sending them back to the United

17   States.

18         While we agree that it's a significant part of the

19   crime, it's our position that we agree with the government's

20   position as is set forth in Document 56, that it does not rise

21   to the level of being a substantial portion of the crime and

22   therefore that enhancement should not apply.

23         THE COURT:  All right.  Well, I appreciate both your

24   cogent arguments, and I determine that a substantial, in fact

25   the essence of this crime, most of it, certainly a substantial

1   portion occurred in Qatar through the agent of Mr. Lee.  She

2   was his cat's paw, whether wittingly or unwittingly.  None of

3   this would have happened if he hadn't hooked into this lady

4   and got her to either convert or steal a hundred million

5   dollars worth of jewels.

6          So under that guideline, which is 2B1.1 -- I think

7   it's 10.  There are so many little attachments here --

8   (b)(10) -- excuse me for my hoarse voice -- it's plus two for

9   a substantial part of the fraudulent scheme as committed from

10  outside the United States, plus two.

11         And the existence of the outside of the United States

12  also, of course, aided the scheme, because just like Willie

13  Sutton said, that's where the money is.  And plus, it would be

14  highly unlikely that you could find someone -- perhaps there

15  is -- in the United States that had a hundred million dollars

16  worth of jewels just laying around.  There aren't many anyway.

17  There's probably more per capita in a small, oil-rich state

18  where there is quite a bit of money.  If you have ever kind of

19  looked around on the Internet at some of the -- I'll just say

20  some of the people there are quite wealthy.  So plus point 2.

21         So that gets us then to a total offense level before

22  the 5K -- you all correct me if I'm wrong -- of 30.

23         I know you disagree with it, but does anyone disagree

24  with that math?

25         MS. FIELDS:  Not with the math, Your Honor.  Thank

DIRECT EXAMINATION OF SCOTT TERRY

1  you.

2       THE COURT:  And that's preserved, Mr. Brunvand.

3  Well, I don't know if it's preserved given your appeal waiver

4  in the thing.  So we are a plus 30 before the 5K.  There's a

5  criminal history category of I.  Before the 5K that would be

6  an advisory range of 97 to 121 months.  There's a one to

7  three-year term of supervised release.  Restitution I'm

8  reserving on.  Forfeiture I'm reserving on.

9       Did the fine range change, Lawyer?

10      PROBATION OFFICER:  Yes.  30 to 250.

11      THE COURT:  And I'm being facetious, but she helps

12  keep me straight on all this detail.

13      So the fine range changed from 30 to 250, and a $200

14  special assessment.

15      Government, give me everything you've got.  You have

16  a two-point 5K.  And the 5K1 says I'm to give substantial

17  deference to the government's view on that.  So I do give

18  deference to that.  And I do grant the motion the government

19  said.  I'm just going to take off two points, which is what

20  they recommended, which puts us back at a 28 starting out,

21  which is 78 to 97 months.

22      Now, that should create no comfort for Mr. Brunvand

23  because he's going to need to talk to me why I don't need to

24  vary upward.

25      Government, give me everything you've got.  We're at

DIRECT EXAMINATION OF SCOTT TERRY

 1   a 28, criminal history category I.

 2           MS. FIELDS:  Thank you, Your Honor.

 3           THE COURT:  After the 5K.

 4           MS. FIELDS:  After the 5K, Your Honor.

 5           Your Honor, as this Court knows, this was a very

 6   serious offense involving almost a hundred million dollars,

 7   potentially more than that on replacement values as you've

 8   heard today.  This is an offense that the victim, Victim 2 had

 9   no idea was occurring within his household.

10           In this particular circumstance, Mr. Lee, and

11   speaking a little bit to the 5K, Mr. Lee, once he was

12   apprehended, quickly came to the table to tell the government

13   where he had disposed of the stones, how he obtained these

14   items, what the nature of his relationship was with the

15   individual in Doha that he was speaking with, M.S.  Because of

16   Mr. Lee's assistance early on, the government was able to

17   recover quite a substantial amount of the items that were

18   taken by M.S. and sent to him here in the United States.

19           Particularly, Your Honor, of note in this matter, I

20   think it's important for the Court to recognize that Mr. Lee

21   did not have anything to do with that 20 carat pink being cut,

22   that stone that we heard Mr. Terry talk about, that there's

23   maybe one of five in the world.  Mr. Lee was not a part of

24   cutting that particular stone.  That occurred after that stone

25   left his hands.  And I don't know that that would have been

DIRECT EXAMINATION OF SCOTT TERRY

1  reasonably foreseeable to him that it would have occurred,

2  that it would have been resized or reshaped in any way.

3          Additionally, Your Honor, because of Mr. Lee's

4  cooperation and meeting with the government, we were able to

5  learn about additional assets that we would have otherwise

6  probably been unaware of.  And what I mean by assets are the

7  things that he purchased with criminal proceeds.

8          As we've laid out before the Court previously, these

9  transactions for these stones were not done in traditional

10 finance terms, right?  We didn't have a wire transfer, a

11 contract.  A lot of it was bartering and trading for

12 additional watches, gold bars, sums of cash.  And when those

13 particular items that he had acquired, you know, some cash,

14 some gold bars were used to purchase vehicles and other items,

15 some in other individuals' names, it would have been next to

16 impossible for the United States to be able to make the

17 connection that these items that have now been recovered were

18 directly linked to the criminal offense.

19         And so because of that, not only were we able to

20 acquire many of the stolen items back, but we were able to

21 also acquire a vast majority of the proceeds that Mr. Lee

22 obtained from the sale of those items.

23         Additionally, Your Honor, in the course of that

24 proffer, he disclosed to the government that he had given part

25 of these proceeds to his children and how he had directed his

DIRECT EXAMINATION OF SCOTT TERRY

1  children to save the money or to store the money.  And I know

2  that that's never something that would be easy for a parent to

3  do, to come in and tell how your children were involved in a

4  crime that you committed.

5       Your Honor, as it pertains to the items recovered, we

6  knew that there were 17 items that had been stolen, and we

7  keep calling them the initial 17.  And those were the items of

8  the high value, the 103-carat diamond, the 66 carat, the 75,

9  the pink.

10      Victim Number 2 learned that those items were gone

11  when Victim 1, M.S., we'll refrain from calling her victim,

12  but when M.S. disclosed to him that she had shipped these

13  items to Mr. Lee.  What M.S. did not disclose was over 30

14  additional items going back months before that she had taken

15  and shipped to Mr. Lee.  When those items were recovered,

16  Mr. Lee sat down and looked through each and every one to tell

17  the government and Qatari officials -- and I'll get to that --

18  which items he had obtained directly from her.

19      As the Court is aware, M.S. was interviewed.  She was

20  also deposed under a Rule 15 deposition.  She never admitted

21  to taking those items.  And there is no other connection to

22  Doha for Mr. Lee but M.S.  And the Federal Express records

23  that we retrieved from our Doha partners or the Qatari

24  authorities suggest the package had been shipped multiple

25  times before the jewelry, the 17, the original 17.  So without

DIRECT EXAMINATION OF SCOTT TERRY

1   Mr. Lee's assistance, Victim Number 2 may have never been

2   aware that these items had been stolen, and they may never

3   have been in a position to be returned to Victim Number 2.

4          Finally, Your Honor, in his assistance with the

5   Qatari law enforcement officials during the course of this

6   investigation, the government of Qatar enacted a new provision

7   or a new statute that allowed for a witness to receive certain

8   protections for giving information, similar to what we would

9   call proffer here.  They had never recognized that before,

10  never had conducted one before.  Mr. Lee was actually the

11  first individual that had ever received the benefit of their

12  new law in that he was able to sit down with the Qatari

13  prosecutor and law enforcement and explain to them exactly

14  what occurred with M.S.

15         Your Honor, there are certainly some questions as to

16  M.S.'s credibility and the veracity of her statements.  We do

17  have conflicting stories as to what occurred here, but what we

18  can say is that Mr. Lee substantially assisted in assisting in

19  the recovery of items we may not have known about, returning

20  items that Victim Number 2 had not known were stolen and

21  telling every bit of information that he knew to the Qatari

22  authorities to assist in their investigations of M.S.

23         So for those reasons, Your Honor -- oh, I apologize.

24  May I have just a moment?

25         And, Your Honor, just for the Court's knowledge, it's

DIRECT EXAMINATION OF SCOTT TERRY

1  our understanding at this time that M.S. was convicted of

2  theft in Doha, that she has been sentenced to 10 years.  It's

3  our understanding that though we have tried as much as we

4  could to receive some sort of judgment from their court there,

5  that their courts do not finalize judgment until an appellate

6  court reviews it.  The appellate court has not finalized the

7  review.  It is certainly possible that the appellate court

8  could change the sentence or even remove that conviction.  I

9  believe for colloquial terms the best to describe it is it's

10  like a report and recommendation from a magistrate judge and

11  the district court is reviewing it and deciding whether or not

12  he is going to approve.  That's a similar circumstance that

13  they're in now.  So the information they are willing to share

14  is that she was convicted of theft and a couple of other

15  charges.  She has been sentenced to 10 years and they're

16  waiting on their appellate court to determine whether or not

17  they are going to uphold the convictions as well as the

18  sentence.

19        But for those reasons, Your Honor, the government is

20  requesting, as you've already said, granting the two-level 5K

21  as well as sentencing Mr. Lee within the guideline range after

22  that two-level reduction.

23        THE COURT:  All right.  Thank you.

24        MS. FIELDS:  Thank you, Your Honor.

25        THE COURT:  Mr. Brunvand, let me just tell you some

1  of my thoughts because I don't want you to be surprised at

2  what I'm thinking.

3         So I know technically, arguably, but I think under

4  the guidelines there is only one victim, which is the owner of

5  the goods, but there's actually a lot of people hurt, you

6  know.  This lady is doing 10 years in Qatar.  She wouldn't

7  have done 10 years or a day if Mr. Lee hadn't put her up to

8  it.  We have got a couple lawyers here for people that are

9  out, by their lights, almost 3 million bucks and he didn't

10  have anything particular to do with that.  But when you fence

11  hot goods, they get around and people get burnt.  You know,

12  that wouldn't have happened.  These two lawyers wouldn't have

13  been here but for your client.

14         This other fellow, whatever his name is that either

15  sold or pawned the big diamond to the Grunbergs, I mean, we

16  all know quite well if there's not lawsuits already, there's

17  going to be lawsuits.

18         So the nature of the fraud was really shocking

19  because, at least as I understand it, it was a real intimate,

20  personal -- I don't mean sexually intimate, but the spiritual

21  adviser, you know, personal, emotional trust that of course

22  never existed other than the fleece, the guy in Qatar.  As I

23  understand it, the final email where he says quit stalking me,

24  you need a psychiatrist, what's wrong with you, lady, that was

25  remarkably cruel to this woman.  It was just an unbelievable

DIRECT EXAMINATION OF SCOTT TERRY

1  amount of money.  I don't think I've had, other than a forex

2  case that some people are aware of that was tried here, I

3  don't think I have had a crime that was over a hundred million

4  bucks.

5      It is just remarkably bold, remarkably reckless.  We

6  are sending a 102-carat diamond ring or a 40-carat pink ring,

7  just pop it in FedEx like I send my kid his tennis racquet

8  when he forgot it at home and went off to college.  It's just

9  unbelievable the recklessness of this.

10      And also, you know, I appreciate his cooperation, and

11  that was really good because otherwise he was going to get a

12  lot more time from me, but also there is just a ton of

13  collateral crimes that we're just forgiving and ignoring, for

14  example, all these fencing crimes in Florida and New York

15  state, federal fencing crimes, a lot of money laundering,

16  which of course we all know has higher punishment under the

17  guidelines, Travel Act violations, repeated Travel Act

18  violations, RICO, you know.  So anyway, that's what -- this is

19  a notable grift, fraud, whatever you want to call it, notable.

20      And so that's kind of what I'm thinking, but I want

21  to hear any allocution you might have.  Mr. Lee is welcome.

22      Mr. Lee, you are welcome to speak.  You are not

23  required to, but let's hear from Mr. Brunvand and/or Mr. Lee

24  at this time.

25      MR. BRUNVAND:  Your Honor, I would suggest, first of

DIRECT EXAMINATION OF SCOTT TERRY

1  all, that this is not a scenario where Mr. Lee has the

2  knowledge of what these jewels are.  I mean, it's not like he

3  is instructing her or they're FaceTimeing in the safe and that

4  he has any clue initially of the significant value of these

5  diamonds and the jewelry that was stolen.

6       You know, it's troubling that frequently in fraud

7  cases and in theft cases, the line between victims and

8  perpetrators are not real clear.  And I'm not suggesting at

9  all that Mr. Lee is anything but a perpetrator.

10      But I think it's important, for example, for the

11 Court to know that, for example, one of the victims whose

12 letter you received this morning in the court file, when

13 transactions took place relating to the purchase or the loan

14 or whatever the heck it is of this diamond, you know, that

15 particular person is asking the seller or the person who is

16 wanting to borrow money if he's wired and is asking him to

17 basically strip down to make sure he's not wired.  And when

18 FBI comes knocking, that person lies to the FBI.

19      And I would suggest that there are -- yes, my client

20 stole an enormous amount of jewelry, whether it's 90 million

21 or 100 million, no doubt about it.  He's not someone who is

22 sophisticated in the area but sophisticated enough so that he

23 made contact with people in New York City and New Jersey that

24 have sophistication and who were willing to purchase a diamond

25 that we heard here today there might only be four of them in

DIRECT EXAMINATION OF SCOTT TERRY

1  the world.  And I would suggest that Mr. Lee had no idea of

2  the significance of that particular diamond, but the people

3  who were willing to buy, you know, through their little trades

4  with jewelry and cash and gold and what have you, certainly

5  they knew.  Certainly they knew that Mr. Lee did not have the

6  ability -- had they did any due diligence to check on Mr. Lee,

7  they would have known that this was stolen, stolen goods.

8          Now, as it relates to M.S. who is initially referred

9  to as Victim 1 in the initial indictment, the Court indicated

10 but for Mr. Lee she wouldn't have stolen from victim

11 Number 1 -- I mean, Victim Number 2.  I would respectfully

12 suggest that that is not accurate.  It appeared when we took

13 her testimony at Qatar that it is very likely that her former

14 boyfriend, who was also an employee of Victim 2, who was also

15 fired by Victim 2, that the two of them were stealing long

16 before she knew John Lee.

17         And as it relates to the 30 items that was mentioned

18 by the government that were never reported by her and that she

19 claimed she had no connection to, it's interesting because

20 during the daylong testimony that we took in Qatar, while she

21 recognized that each and every one of those items -- as we

22 went through them and showed her the photos, she recognized

23 and agreed that these were unique items that she recognized

24 originally belonged to and came from Victim 2 and yet

25 continued to maintain that she had no involvement in it, had

DIRECT EXAMINATION OF SCOTT TERRY

1  no contact with it.  There was basically -- I think she said,

2  I don't know, maybe somehow someone else took it over there

3  and somehow ended up turning it over to John Lee.

4          So, yes, my client is guilty.  My client accepted

5  full responsibility at the very beginning of this case.  I

6  mean, it wasn't like he was waiting and let's see how this

7  goes.  So from the very beginning when I first spoke with the

8  government and talked about the possibility of should we be

9  seeking pretrial release, and it was suggested that maybe that

10  wasn't a good idea and we agreed, and we sat down and we had

11  multiple meetings with them where we went through -- he was

12  brought over for a full day, at least two full-day meetings at

13  the U.S. Attorney's Office where he went through in great

14  detail and described everything that he had done and did

15  everything he could to assist them in recovering the majority

16  of the items that were stolen.

17          And that's in fact what's happened.  The majority of

18  the items that were stolen have been recovered in one shape or

19  another.  In fact, I think the total restitution amount that

20  the government ultimately will be seeking is going to be less

21  than $10 million.  That's still a significant sum.

22          THE COURT:  A hundred million.

23          MR. BRUNVAND:  I'm sorry?

24          THE COURT:  Less than a hundred million.

25          MR. BRUNVAND:  No.  I think the -- by the time --

DIRECT EXAMINATION OF SCOTT TERRY

1          THE COURT:  You mean net.

2          MS. BEDKE:  Net.

3          MR. BRUNVAND:  Right, right, which shows the

4    significance of his cooperation.  And it included him telling

5    the government about having provided some of these items to

6    his children and his children coming forward and providing the

7    same items to the government.

8          So, Your Honor, I understand the Court, that the

9    Court is troubled by the guideline range and the amount that's

10   involved, although I would suggest we frequently see in white

11   collar cases and cases involving Medicare fraud or defense

12   contracting fraud similar sums.  And I would respectfully

13   suggest that those who end up entering pleas -- and I think,

14   in fact, we had a trial with Your Honor about a year ago where

15   the boss of the organization actually went to trial in Boston

16   and was sentenced to, I think it was a five-year term

17   despite -- and I think that was far in excess of a hundred

18   million dollars.

19         So I would suggest, Your Honor, that a guideline

20   sentence would be appropriate and that an upward departure in

21   this case would be inappropriate.

22         THE COURT:  All right.  Thank you.

23         MR. BRUNVAND:  And Mr. Lee would like to make a

24   statement.

25         THE COURT:  Just grab that mic, Mr. Lee.

DIRECT EXAMINATION OF SCOTT TERRY

1          THE DEFENDANT:  Thank you, Your Honor.

2          I'm a little nervous, but I'm going to try to talk

3    the best way I can.  I'm embarrassed to say I can't read, so I

4    couldn't make a letter to read to you.  So I have to like take

5    it all in, kind of relax.

6          First and foremost, thank you for allowing me to

7    speak.  And I know that when people say they did drugs and

8    they used drugs for an excuse, to say -- in fact, it's

9    embarrassing talking about this in front of my kids, but I'll

10   come to that in a minute, but these past couple years knowing

11   her, I got high on -- forgive me.  I feel embarrassed in front

12   of my kids -- drugs.

13         And when I was incarcerated, I obviously I got off

14   drugs.  I thought about what I did, and I felt devastated

15   because I raised my kids pretty much on my own.  And as a

16   child, I grew up with my parents having welfare.  And when we

17   were hungry, we would look in the mailbox to see if there's

18   food stamps to eat.  And I promised myself I'll never -- if I

19   have children, I will never ask for government assistance for

20   welfare, Medicaid, anything.  I raised my kids on my own.  I

21   had jobs.  I worked hard to support my children.

22         When I got arrested, I had time to sober up.  And the

23   minute I sobered up, I called my attorney and I told him

24   whatever I can do to make it right, I will do it.  And

25   whatever it is, because my richnesses I realized I already

DIRECT EXAMINATION OF SCOTT TERRY

1   had, my children and my grandchildren.  I have a grandchild

2   that's autistic.  Every morning I would take him to learn to

3   play ball, whatever.  I felt like I don't want to -- something

4   I don't want to do before the Court, blame someone else, but

5   this woman made it so kind of easy to a point where -- I don't

6   want to push anything towards her, but she kind of like let's

7   do this and you can get so much and I get so much.  And kind

8   of like, I kind of went along with that, but I robbed, I

9   stole.  I admitted I'm wrong.  I'm totally wrong.

10          But the prosecutor, I did whatever I can do to make

11  it right because I know I made a huge mistake, a huge mistake.

12  In fact, my kids, when they were younger -- I have four --

13  when they would go to Universal or go to Six Flags, I would

14  tell them never steal anything.  I have four children from age

15  35 to 22 never been arrested, never.  Thank God no drugs.

16          I'm embarrassed of myself in front of my children and

17  my grandchildren what I've done.  I have to live with it for

18  the rest of my life.  I grew up poor.  I did whatever I can to

19  raise my kids.  I gave them the best I can.  Christmas Eve I

20  would work not for presents but for wrapping paper, for tape,

21  for extra stockings just to make sure they have it because we

22  didn't have it when we were kids.

23          So I messed up, Your Honor.  And I try, I try to

24  do -- everything I did wrong, I tried to do everything

25  possibly to tell her or to whoever came toward me, John, the

DIRECT EXAMINATION OF SCOTT TERRY

1  agent, everyone.  I said it all.  I gave up stuff.  I don't

2  want nothing.  I said, here, take -- there's more, whatever.

3        I know I'm wrong, Your Honor, I'm wrong.  And it

4  seems that -- it was me.  And I'm not saying again to make it

5  look like I'm trying to push any weight on the other side, but

6  there was involvement.  It wasn't that cut and dry as you

7  think it was.  It was more involved by kind of giving me

8  ideas.  So I apologize to the Court.  Once again, thank you

9  for allowing me to speak.

10        My kids, they're my life.  That's basically it.  And

11  I'm embarrassed.  I have to live with this now in front of my

12  children and my grandchildren.  We are a tight family and

13  we'll manage, make it work.

14        THE COURT:  Thank you, sir.  I appreciate that.

15        Mr. Brunvand, what else does the defense have?

16        MS. FIELDS:  Your Honor, may I have just a moment?

17        THE COURT:  Mr. Brunvand, does the defense have

18  something else?

19        MR. BRUNVAND:  Your Honor, I just want to emphasize a

20  couple things.  Obviously Victim 2 did not know anything about

21  any of this, and Victim 2 is truly a true victim.  His

22  employee -- and you read a message from my client that

23  disturbed you about you need a psychiatrist and what have you.

24        There's another message from her to my client talking

25  about this wasn't our plan.  And the bottom line is --

DIRECT EXAMINATION OF SCOTT TERRY

1          THE COURT:  Did that come when they were in Qatar and

2  he was supposed to meet with the hardware to bring the jewels

3  back?  When did that come?

4          MR. BRUNVAND:  That comes, you know, towards the end.

5  So basically the plan was this, between the two of them, was

6  that she would send jewelry to him, that he was going to have

7  someone here in the U.S. remove some of the diamonds, and he

8  was going to have those replaced with cubic zirconia and send

9  them back to -- and the idea was it will never be --

10         THE COURT:  That's not what's in the plea agreement.

11 That's not what he swore to when he gave his plea.

12         THE DEFENDANT:  I'm sorry.  I told the prosecutor

13 that --

14         THE COURT:  I'm not talking to you.

15         THE DEFENDANT:  Oh, I'm sorry.

16         MR. BRUNVAND:  Well, I think it is.

17         THE COURT:  Well, you want to show me where it is,

18 because the plea agreement suggests that he importuned her and

19 told her that he was going to remove the bad spirits and all

20 that.

21         MR. BRUNVAND:  And those statements take place.

22         THE COURT:  The defendant convinced M.S. to send him

23 jewelry belonging to M.S.'s employer because she continued to

24 experience negative feelings.

25         MR. BRUNVAND:  That is true, and that is the

DIRECT EXAMINATION OF SCOTT TERRY

1  original -- that's the origins of this.  It then translates

2  into her and him coming up with a plan.  So it starts out like

3  that.  And then it transitions into more jewelry being sent

4  over and with her benefiting from it.  I don't believe that

5  that's inconsistent with the plea agreement.

6          THE COURT:  Okay.  What else do you have?

7          MR. BRUNVAND:  I think that's it, Your Honor.

8          THE COURT:  Does that conclude your presentation for

9  the defense?

10          MR. BRUNVAND:  Yes, Your Honor.

11          THE COURT:  Mr. Lee made his statement.  Mr. Lee, I

12  didn't -- you voiced something.  I don't want to cut you off

13  if you have something else to say.

14          THE DEFENDANT:  Your Honor, the reason why I kept on

15  saying I don't want to make it sound like I'm trying to push

16  this on something else, because I'm guilty, totally guilty.

17  But how this all came about, she said, let's make some money

18  and give me some of the money when you switch out the stones.

19  I got selfish and never did it.  That's my part that's wrong.

20  I'm wrong, but I'm wrong from robbing, from taking, but she

21  wanted something, and I was selfish and I said no, but she was

22  involved as well.

23          THE COURT:  All right.

24          THE DEFENDANT:  That's all, Your Honor.

25          THE COURT:  So the Court has heard -- anything else

1    from either side?  I hear nothing.

2         The Court has heard from the defendant why judgment

3    shouldn't be pronounced and found no cause to the contrary.

4    The Court has reviewed the pre-sentence report.  So I stated

5    previously grounds which I think support an upward variance.

6    And as far as the facts go, I rely on the pre-sentence report,

7    which was not objected to, and the plea agreement, not any

8    allocution I just heard because that's not evidence.  The PSR

9    and the plea agreement establish the facts.

10        Pursuant to 3551 and 3553, it's the judgment of the

11   Court that the defendant is committed to the custody of the

12   Bureau of Prisons for a term of 17 years, which is 17 years on

13   Count 4, and 10 on Count 7 to run currently.  The reason for

14   this upward variance I have already stated.  The defendant

15   committed at least 10, 12 other major felonies which he wasn't

16   charged with, and all this under 3553(a)(2)(A), the

17   seriousness of the offense behavior, needs to promote respect

18   for the law and provide just punishment.  This was a very

19   large, very cynical, very transnational massive fraud.  It

20   involved a lot of people, left a lot of collateral damage.

21        We've got some lawyers here talking about it.  We had

22   a gemologist that did a bunch -- this is a big fraud, and the

23   seriousness of the offense supports this upward variance.  And

24   also to avoid unwarranted sentence disparity in what I'll call

25   the hundred million dollars range of a fraud.

DIRECT EXAMINATION OF SCOTT TERRY

1          So upon release from imprisonment, there's a

2    three-year term of supervised release as to Counts 4 and 7,

3    which runs concurrent.  And while on supervised release, you

4    will have to comply with the mandatory and standard conditions

5    adopted by the Middle District which can be found at 5D1.3(a)

6    and (c) of the sentencing guidelines.  In addition, the

7    following special conditions:

8          You will have to participate in a substance abuse

9    program, out-patient or in-patient, and follow the probation

10   office's instructions regarding implementation of this

11   directive, and contribute to the cost of these services not to

12   exceed an amount determined reasonable by the probation

13   office's sliding scale for substance abuse treatment services.

14          During and upon completion of this program, you are

15   directed to submit to random drug testing.  You will have to

16   participate in a mental health treatment program, out-patient

17   or in-patient, and follow the probation office's instructions

18   regarding implementation of this directive.  You will have to

19   contribute to the cost of these services not to exceed an

20   amount determined reasonable by the probation office's sliding

21   scale for mental health treatment services.

22          You are prohibited while on supervised release from

23   incurring new credit charges, opening additional lines of

24   credit or obligating yourself for any major purchases without

25   approval of probation because you will have a restitution

DIRECT EXAMINATION OF SCOTT TERRY

1  judgment against you, which I have deferred on that and we'll

2  have further hearings on that, probably combine that with our

3  forfeiture hearing which will happen later as well.  You will

4  have to provide the probation officer access to any requested

5  financial information.

6       As to those future hearings, if the defendant wishes

7  to waive his presence, that's fine.  I need a written signed

8  waiver of his presence.  Otherwise, it might be better to just

9  go get this started, you know, but if you want to stick around

10  for these hearings, it's going to be probably several months

11  from now.

12       You will have to submit to a search of your person

13  while on supervision, a search your person, residence, place

14  of business, any storage units under your control, computer or

15  vehicle conducted by the U.S. Probation Office at a reasonable

16  time and in a reasonable manner based upon reasonable

17  suspicion of contraband or evidence of violations of

18  conditions of release.  And you will have to inform any

19  residents that the premises may be subject to search pursuant

20  to this condition, and failure to submit to search may be

21  grounds for revocation.

22       You will refrain from any employment related to being

23  a psychic or providing love or relationship advice or any

24  adviser job related to advising people by whatever name that

25  occupation is known.

DIRECT EXAMINATION OF SCOTT TERRY

1    Having been convicted of a qualifying felony, you

2   will have to cooperate in the collection of DNA as directed by

3   probation.  Mandatory drug testing requirements of the Violent

4   Crime Control Act are suspended.  You will have to submit to

5   random drug testing, however, not to exceed 104 per year.

6   Restitution is deferred pursuant to 18 U.S.C. 3554(d)(5).  A

7   date for the final determination of victim losses will be made

8   under separate order and not to exceed 90 days from today.

9    So Mr. Gooding-Butts, please put that on my calendar

10   so we don't miss it.

11    I will have Mr. Lee present for that hearing unless

12   he waives his presence in writing.  So if I don't see a

13   written waiver, then he's going to be here.

14    Based upon the financial status, I waive the

15   imposition of a fine.  The same thing on the forfeiture.  The

16   claimant's lawyers and the government will please work

17   together and submit to me the appropriate order for me to

18   sign.

19    Yes, ma'am.

20    MS. CREAM:  Your Honor, the parties have conferred.

21   They have no objection to the amended preliminary order of

22   forfeiture for direct assets that was submitted along with

23   Docket 73, the motion.  So that would be final as only to

24   Mr. Lee's interests.  And we would have an ancillary

25   proceeding as to any third-party interest.

DIRECT EXAMINATION OF SCOTT TERRY

1      THE COURT:  Let me know if we need to do a little

2  discovery piece.  If anybody wants discovery, file a motion.

3  I'm inclined to grant it.  Not some crazy thing with 20 depos,

4  but I'm inclined to grant that, also for the defense.

5      So I will ask Mr. Gooding-Butts then to sign that

6  amended order of forfeiture electronically in my name, which

7  he does occasionally.  There is a $200 special assessment

8  which is due immediately.

9      Pursuant to 3553(a)(1) through (7), I find the

10  sentence imposed -- and I have stated the grounds for upward

11  variance -- is sufficient but not greater than necessary to

12  comply with the statutory purposes of sentencing.  I'm

13  satisfied the plea agreement reflects the seriousness of the

14  offense behavior and that accepting the plea agreement given

15  this upward variance will not undermine the statutory purposes

16  of sentencing.

17      Counts 3, 5 and 6 of the plea agreement -- counts 1.

18  Let me spit that out.  One through three, five, and six of the

19  indictment are dismissed.

20      Having pronounced sentence, government, any objection

21  beyond those previously noted?

22      MS. FIELDS:  No, Your Honor.  Thank you.

23      THE COURT:  Mr. Brunvand, whatever you need for the

24  record we will take it now.

25      MR. BRUNVAND:  Your Honor, no objections other than

DIRECT EXAMINATION OF SCOTT TERRY

1  the objections that have been previously raised.  We would ask

2  for a recommendation for placement at Coleman, and also that

3  he be -- a recommendation that he be allowed to participate in

4  drug treatment, including an intensive drug treatment program.

5          THE COURT:  Those are granted.

6          To the extent permitted by your plea agreement, sir,

7  you have a right to appeal from this judgment and sentence

8  within 14 days.  Failure to appeal within that period is a

9  waiver.  Mr. Brunvand will take care of that.  The government

10  may also file an appeal from the sentence, and I will have the

11  clerk accept any such filing without cost.

12          Anything else, government?

13          MS. BEDKE:  Your Honor, would it be possible for us

14  to set a date for the restitution hearing, only because under

15  18 U.S.C. 3664(d)(5), I believe, we have to accomplish that

16  within 90 days.

17          THE COURT:  All right.  I'm going to ask

18  Mr. Gooding-Butts to set that in 60 days.

19          MS. BEDKE:  Thank you, Your Honor.

20          THE COURT:  And you all from Reed Smith, don't be

21  shy.  If you need something call, or file a motion if it's

22  formal.

23          MS. GATZ:  Thank you, Your Honor.

24          THE COURT:  I appreciate you all working with the

25  government very much.

DIRECT EXAMINATION OF SCOTT TERRY

1          Anything else from the defense?

2          MR. BRUNVAND:  No, Your Honor.  I will be filing a

3   motion to withdraw for purposes of the appeal and notice of

4   appeal.  My only concern is if he gets transported, I'm having

5   surgery this weekend, and then I'm going to be out of

6   commission for at least a week.  So I don't know if you can do

7   an inquiry about him being indigent?

8          THE COURT:  I assume that he is.  Just to be brutally

9   candid, he's certainly going to be when the restitution order

10  comes out.  So let's get that notice of appeal filed.

11         MR. BRUNVAND:  I will.

12         THE COURT:  I will then ask Mr. Gooding-Butts as soon

13  as that's filed to discharge you as counsel and to appoint

14  counsel.  We have to do it randomly so I don't have like court

15  favorites, so to make a random selection for Mr. Lee's appeal.

16         MR. BRUNVAND:  Yes, Your Honor.

17         THE COURT:  Thank you.

18         Thank you, everyone.  Good luck.

19      (Proceedings concluded at 1:02 p.m.)

20

21

22

23

24

25

 1 | UNITED STATES DISTRICT COURT    )
   |                                 )
 2 | MIDDLE DISTRICT OF FLORIDA      )

 3 |                    **REPORTER TRANSCRIPT CERTIFICATE**

 4 |

 5 |      I, Tracey Aurelio, Official Court Reporter for the United
   | States District Court, Middle District of Florida, certify,
   | pursuant to *Section 753, Title 28, United States Code*, that
 6 | the foregoing is a true and correct transcription of the
   | stenographic notes taken by the undersigned in the
 7 | above-entitled matter (Pages 1 through 62 inclusive) and that
   | the transcript page format is in conformance with the
 8 | regulations of the Judicial Conference of the United States of
   | America.

 9 |

10 |                                  /s   *Tracey Aurelio*
   |                                  _____
11 |                                  Tracey Aurelio, RMR, RDR, CRR
   |                                  Official Court Reporter
12 |                                  United States District Court
   |                                  Middle District of Florida
13 |                                  Tampa Division
   |                                  Date:  May 21, 2024

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |